# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| IN RE | CASE NUMBER |
| **RISA ROZELLA HILL,** | **17-56656-SMS** |
| Debtor. | CHAPTER 7 |
| **RISA ROZELLA HILL,** | |
| Plaintiff, | ADVERSARY NUMBER |
| v. | **17-5131-SMS** |
| **EDUCATIONAL CREDIT MANAGEMENT CORPORATION,** | |
| Defendants. | |

## PLAINTIFF'S TRIAL BRIEF

Plaintiff Risa Hill respectfully submits this Pre-Trial Brief pursuant to the Court's Joint Consolidated Pretrial Order dated July 17, 2018 ("PTO").

**I.    Statement of the Case**

Risa Hill is a disabled veteran who relies on government assistance for income, food, shelter, and medical care. Ms. Hill suffered from psychosis, was homeless, and was involuntarily hospitalized. Since finishing school, Ms. Hill kept in contact with her student loan servicers, never once defaulting, and only filed bankruptcy after working out numerous forbearances and deferments. The Department of Education consented to the discharge of its portion of her student loans. Nevertheless, ECMC insists that Ms. Hill pay her student loans.

Ms. Hill enrolled at Wichita State University in 1999 after serving in the Army. She graduated with a B.A. in 2002, having paid for her education with student loans. In summer of 2003, she enrolled at Newman University and in 2004 graduated with an MSW and more student loans. In early 2005, Ms. Hill consolidated several of her student loans. In September of 2005, she enlisted with the Army National Guard and, while enlisted, attended school at DeVry University, where she graduated with an MBA in Fall 2008. During that time, she took three online courses at Troy University. She enrolled at DeVry for a few more courses in 2009 but did not obtain any other degrees. At this point, she had accrued roughly $200,000 in student loans.

In October of 2013, while working in Texas, Ms. Hill began to experience symptoms of psychosis. The psychosis rendered her unable to work, and she found herself in an airport in Louisiana with no memory of how she got there. She was hospitalized several times in Texas, Arizona, and Florida, and was homeless for several months. During this time, she was diagnosed with bipolar disorder, type 1 with psychotic features. She was involuntarily committed by the Georgia Department of Behavioral Health & Disabilities on June 2, 2014. She was later also diagnosed with Post-Traumatic Stress Disorder ("PTSD").

As a result, in 2015, the Social Security Administration determined her eligible to receive Social Security Disability Insurance. Ms. Hill's sole monthly income is $1,341 in Social Security Disability Insurance. She receives $16 in food stamps and a housing voucher based on her low income status. As of the bankruptcy filing date, she paid only $205 toward her rent. Based on Ms. Hill's household size of 1, she is below 150% of the applicable federal poverty guideline of $1,517.50 per month.

As a result of her mental illness, Ms. Hill is not able to engage in any substantial gainful activity. Even if she could work, she would risk losing her healthcare and thus access to her medication. Without her medication, her condition would worsen rapidly. While she meets with a Licensed Professional Counselor to improve her PTSD, bipolar disorder with psychosis is a lifelong condition.

Defendant points out that Ms. Hill has worked several jobs in the human resources field, earning $27,895.00 in 2011, $39,673.00 in 2012, and $26,589.16 in 2013 and has not made student loan payments. Plaintiff does not dispute that she has not made payments. However, since finishing school, Ms. Hill has remained in contact with her student loan servicers and has applied for and received several deferments and forbearances. On the petition date, none of her student loans were in default. If she were required to repay her student loans, it would severely hardship her.

Defendant ECMC suggests that "the best option for the Plaintiff is the Revised Pay as You Earn ("REPAYE") program where a monthly payment of $0 would service the debt based on Plaintiff's income and family size. Following 20 years of participation in the REPAYE program, Plaintiff's debt is cancelled." However, if Ms. Hill were to enroll in REPAYE, she would first have to consolidate her loans. Further, for Ms. Hill, "REPAYE" is no repayment at all. Her monthly payments would be $0 and the balance of the student loans would increase, not decrease. Despite her continued inability to work, the loans would continue to hang over her head. Assuming the REPAYE Program continues under subsequent administrations, at the end of the term (240 months), the balance of the debt would be cancelled subject to potential taxes. Furthermore, remaining in the program entails an annual recertification, which would be difficult

3

to comply with if Ms. Hill's condition were to worsen again. If she failed to recertify and subsequently defaulted, Defendant could offset her SSDI payments.

Defendant asserts that Plaintiff should be required to apply for an administrative cancellation instead of seeking a discharge before this court. The Code does not require a debtor to plead with a creditor for a fresh start, and Congress did not enact any such administrative exhaustion requirement. In asking this court to deny a discharge to Ms. Hill because she is disabled (and purportedly eligible for administrative cancellation) and low income (and purportedly eligible for $0 income-based payments), Defendant is effectively asking the Court to adopt a rule barring bankruptcy relief for the class of student loan borrowers who need it most. This cannot be what Congress meant by "undue hardship."

## II.      Legal Standard

Student loans are excepted from discharge under Section 523[1] unless such exception "would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). "Undue hardship" is not defined in the Code, and the prevailing test, as adopted by the Eleventh Circuit, is set forth in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2d Cir.1987). *In re Cox*, 338 F.3d 1238 (11th Cir. 2003) (adopting *Brunner*).

To support a finding of undue hardship under *Brunner*, the debtor must show:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;
(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
(3) that the debtor has made good faith efforts to repay the loans.

---

[1] All references in body text to "Sections" or "the Code" refer to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (2018), unless otherwise indicated.

4

*Cox*, 338 F.3d at 1241 (quoting *Brunner*, 831 F.2d at 396). The standard of proof for each of these prongs is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991) ("[T]he standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard").

"[T]he Brunner test leaves an avenue of relief and is an effective tool for identifying those debtors whose earning potential and circumstances make it unlikely that they will produce the means necessary to repay the student loans while maintaining a minimal standard of living." *Cox*, 338 F.3d at 1242. Thus, the "essence" of the *Brunner* test is "an inability to pay that is likely to continue for a significant time," *id.*, but the "forward-looking test" embodied by the second prong "focuses on whether a debtor has shown her inability to repay the loan during a significant portion of the repayment period. It does not look backward to assess blame for the student debtor's financial circumstances." *In re Acosta-Conniff*, 686 F. App'x 647, 650 (11th Cir. 2017).

In analyzing the final prong (good faith), courts look to whether the debtor's inability to pay resulted "from factors beyond [the debtor's] reasonable control." *In re Mosley*, 494 F.3d 1320, 1327 (11th Cir. 2007). Thus, "failure to make a payment, standing alone, does not establish a lack of good faith." *Id.* (quoting *Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1311 (10th Cir. 2004) (internal quotation marks omitted)); s*ee also McGinnis v. Pennsylvania Higher Education Assistance Agency (In re McGinnis)*, 289 B.R. 257, 267 (Bankr. M.D. Ga. 2003) ("Actual payments are not necessary to show good faith." (citations omitted)).

5

### III. Argument

Ms. Hill lives in poverty. She receives fixed income from the government as a result of her disability. She relies on government assistance for her medical care, food, and housing. It is undisputed that Ms. Hill, who currently receives $1,341 in Social Security Disability Insurance, is below 150% of the federal poverty guideline. (PTO ¶ 8.BB–CC). There is simply no way Ms. Hill could maintain a "minimal" standard of living for herself if forced to repay her loans.[2] Nonetheless, ECMC asserts a number of reasons that the loans should not be discharged. Ms. Hill addresses these arguments below.

#### A. Circumstances beyond Ms. Hill's control prevent her from increasing her income.

Ms. Hill experienced a psychotic break in October 2013 and was subsequently hospitalized several times. She was diagnosed with bipolar disorder type 1 with psychotic features. After several involuntary committals, Ms. Hill applied for assistance from the Social Security Administration ("SSA"). After the SSA weighed the medical evidence, the SSA determined that she met the standard for disability under their rules and granted her Supplemental Security Income during the standard five month waiting period for Social Security

---

[2] Defendant unilaterally reduced Ms. Hill's loan balance to $70,000. (PTO ¶ 8.B.). Even assuming repayment based on this lower amount, at a standard 6% fixed rate for graduate loans over a standard 10-year repayment, Ms. Hill could not afford the monthly payment of $777.14, which would constitute over half of her monthly income. In fact, her meager surplus of $188 would not even pay the monthly interest of approximately $350 at that rate.
*See* Annual Notice of Interest Rates of Federal Student Loans Made Under the William D. Ford Federal Direct Loan Program On or After July 1, 2013, 82 Fed. Reg. 29062 (June 27, 2017); *see also* Ed. Dep't, *Understand how interest is calculated and what fees are associated with your federal student loan*, FED. STUDENT AID, https://studentaid.ed.gov/sa/types/loans/interest-rates#rates (last visited Sept. 10, 2018) (listing 6.6% interest rate for Graduate or Professional loans made after July 1, 2018); *see also supra* at 10.

6

Disability Insurance ("SSDI"). 42 U.S.C. § 423(c)(2). She began receiving SSDI after that period.

The evidence will show that the Social Security Administration determined Ms. Hill's date of disability onset as October 15, 2013, and that she still receives SSDI. Ms. Hill has a representative payee who receives her SSDI payments and releases the funds for her. Her medications and therapy are largely funded by Medicare and a Medicare Savings Program. Her only income is the SSDI, and she does not work. If Ms. Hill were able to work, regardless of whether she actually worked or not, she would no longer receive SSDI and she would lose her healthcare.

Under Title II of the Social Security Act, Social Security Disability Insurance is authorized for disabled or blind adults who are insured by their own (or certain family members') contributions to Social Security trust funds. Social Security Program Operations Manual System ("POMS"), DI 00115.001(A). Social Security does not pay SSDI to people who are not totally disabled. *Id.*

For the purposes of SSDI, an individual cannot just be disabled in the common sense of the word; she must be unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.A. § 423(d)(1)(A). Substantial gainful activity is defined as "work that – (a) involves doing significant and productive physical or mental duties; and (b) is done (or intended) for pay or profit." 20 C.F.R. § 404.1510. Explicitly, other activities are ordinarily not the substantial gainful activity Social Security considers in this analysis, including self-care, therapy,

7

general social activities, and everyday tasks. 20 C.F.R. § 404.1572. The SSA must determine whether, with consideration of all of an applicant's impairments and limitations, she can engage substantial gainful work that is within the national economy. *Id.* at (d)(2). The SSA has continuously determined Ms. Hill qualifies for SSDI under these rules.

Recipients of SSDI receive Medicare for medical insurance. Medicare covers a variety of medical services, including regular exams, supplies, surgeries, prescriptions, inpatient and outpatient mental health care, laboratory services, health screenings, and others. *Is your test, item, or service covered?*, MEDICARE.GOV https://www.medicare.gov/coverage/is-your-test-item-or-service-covered.html (last visited Sept. 10, 2018). Without Medicare, Ms. Hill could not receive the services and medications that are necessary for her to function.

Ordinarily, a monthly insurance premium is removed from a beneficiary's SSDI amount for Medicare Part B, but qualified Medicare beneficiaries may also be eligible for programs to pay premiums. 42 U.S.C.A. § 1396d(p). One Medicare Savings Program is the Qualifying Individual Program, and it pays the monthly premium for Medicare Part B for beneficiaries who meet the financial limit ($1,386 per month for an individual in 2018). This program is part of the State of Georgia's Medicaid program and is administered by the Georgia Division of Family and Children Services. Georgia Division of Family and Children Services, Medicaid Manual (07/01/2018), Section 2145; *Medicare Savings Programs*, MEDICARE.GOV, https://www.medicare.gov/your-medicare-costs/help-paying-costs/medicare-savings-program/medicare-savings-programs.html (last visited Sept. 10, 2018). Ms. Hill qualifies and has been enrolled in the Qualifying Individual Program since 2016.

Ms. Hill's disabilities are beyond her control, and – even after diligent treatment and medication – she is still disabled and unable to engage in substantial gainful activity.

**B.     The availability of administrative discharge or income-based repayment does not preclude a discharge of Ms. Hill's loans.**

Evidence will show that Ms. Hill stayed in contact with the loan servicer, was never in default on the loans (even during and immediately after her psychotic break), consolidated her loans, and requested deferments and forbearances to avoid defaulting on the student loans. Courts have recognized these actions as good faith efforts. *In re Michaud*, No. 8:13-AP-603-KRM, 2014 WL 3362157, at 4 (Bankr. M.D. Fla. Jul. 9, 2014) (debtor was never in default); *In re Fields*, No. 10-70021, 2012 WL 3235844, at 7 (Bankr. N.D. Ala. Mar. 23, 2012) (debtor sought and obtained forbearances and deferments); *see also In re Barrett*, 487 F.3d 353, 365 (6th Cir. 2007) (debtor obtained economic deferments); *In re Braine*, No. 10-10391, 2012 WL 909317, at 8 (Bankr. D. Vt. Mar. 16, 2012) (debtor consolidated loans and requested deferments and forbearances to avoid default).

The law does not require Ms. Hill to prove that she entered into another repayment plan or tried to discharge the student loans in another way. The good faith analysis is not so simple, and a debtor's choice not to seek administrative discharge or income-based repayment is not per se bad faith. *In re Johnson*, 541 B.R. 759, 766–67 (Bankr. N.D. Ala. 2015) ("The U.S. Department of Education's repayment plans may not be used as a sword to prevent dischargeability of student loans if the debtor chooses not to participate in them."); *see also Mosley*, 494 F.3d 1320, 1327 (failure to enroll in ICRP does not detract from good faith)*; In re Champagne,* No. 6:10-BK-14228-ABB, 2012 WL 293736, at 4 (Bankr. M.D. Fla. Jan. 12, 2012)

9

("There is no per se rule a debtor cannot show good faith where he or she has not enrolled in an income-contingent repayment program."). Bankruptcy courts in the Eleventh Circuit have noted a need to "evaluate the debtor's conduct in the broader context of her entire financial picture." *In re Gordon*, No. ADV.07-009049-MGD, 2008 WL 5159783, at 8 (Bankr. N.D. Ga. 2008) (quoting *In re Nary,* 253 B.R. 752, 768 (N.D. Tex. 2000)). *See also Mosley*, 494 F.3d 1320, 1327. This includes evaluating whether a debtor is living in poverty. *Mosley*, 494 F.3d 1320, 1327*; In re Rutherford,* 317 B.R. 865, 880 (Bankr. N.D. Ala. 2004).[3]

Repayment plans such as the REPAYE program and the Income Contingent Repayment Plan are available for most debtors with federal student loans. *See, e.g.*, *Choose the federal student loan repayment plan that's best for you*, FED. STUDENT AID, https://studentaid.ed.gov/sa/repay-loans/understand/plans (last visited Sept. 10, 2018). If the option of another repayment plan defeated any bankruptcy student loan adversary case, the purpose of the student loan bankruptcy discharge would be circumvented and make any student loan bankruptcy discharge practically impossible. "Unlike the Income Contingent Repayment Plan, bankruptcy relief is designed to give the honest but unfortunate debtor a fresh start, and although government guaranteed student loans are meant to be more difficult to discharge than general unsecured debts, they are not meant to be impossible to discharge." *Rutherford*, 317 B.R. 865, 880–81, quoting *In re Korhonen*, 296 B.R. 492, 497 (Bankr. D. Minn. 2003).

Furthermore, assuming a hypothetical 20-year repayment period vastly extends the undue hardship inquiry beyond what the *Brunner* court could have imagined. Judge Frank of the U.S. Bankruptcy Court for the Eastern District of Pennsylvania compiled the most extensive

---

[3] Courts have also recognized potential tax consequences to discharging student loans under an income-contingent repayment program as a valid reason not to enroll in the program. *Mosley*, 494 F.3d at 1327.

discussion to date of the "repayment period" in *Price v. DeVos (In re Price)*, 573 B.R. 579 n.24, 599 (Bankr. E.D. Pa. 2017), *rev'd on other grounds*, *DeVos v. Price*, 583 B.R. 850 (E.D. Pa. 2018).[4] He noted that using a 10-year contractual repayment period best comported with the historical context of *Brunner* and limits the inquiry to "specific articulable facts, not unfounded optimism." *Id.* at 604 (quoting *Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1310 (10th Cir. 2004) (internal quotations omitted)). Judge Frank expressed concern that using a hypothetical extended or income-contingent repayment period not actually chosen by the debtor "would be making the Debtor's financial decisions for her, treating her as though she is actually on this repayment plan, while she is still contractually obligated to make much larger monthly payments," *id.* at 606, and that "[s]uch a failure to engage in a grounded, realistic analysis not only creates the danger of an overly-strict application of Brunner, but also raises legitimate concerns about both the integrity of the judicial decision making process, as well as the public's perception of the process." *Id.* at 604.

The third part of the Brunner test asks whether the debtor has made "good faith efforts to **repay** the loans." *Brunner*, 831 F.2d 395, 396 *(emphasis added)*. There is no language about attempts to **avoid paying** the loans, whether by making $0 payments for 20 years or by applying for administrative cancellation, and the subsequent Eleventh Circuit case adopting *Brunner* did not add any such requirement to the prong. *Cox*, 338 F.3d 1238, 1241. An administrative

---

[4] *Price* was reversed on other grounds. *See DeVos v. Price*, 583 B.R. 850, 855–56 (E.D. Pa. 2018) ("The bankruptcy court, after discussing *Brunner's* historical context and evaluating the parties' arguments, determined that the repayment period should be based on the original contract term . . . . The length of the repayment term as it relates to the second element of *Brunner* is a difficult question. For purposes of this decision, however, the court does not need to resolve this issue.").

discharge would not require Ms. Hill to pay the loans, and the REPAYE program as proposed by Defendant would require Ms. Hill to make payments of $0. That is no payment at all. Requiring an impoverished debtor to do so "would be a fruitless exercise to shackle the debtor to a contingent repayment plan." *Al-Riyami v. U.S. Dep't of Educ. (In re Al-Riyami)*, No. 12-80935, 2014 WL 2800815, at 4 (Bankr. M.D. Ala. Jan. 6, 2014), *aff'd*, No. 3:14-CV-73-WKW, 2014 WL 1584481 (M.D. Ala. Apr. 21, 2014).

### IV.    Conclusion

Ms. Hill contends that the evidence will show that she is entitled to a discharge of her student loans and requests the court enter an order discharging them after trial.

Respectfully submitted September 11, 2018.

>  */s/ Cari E. Hipp*
>  **Cari E. Hipp**
>  Ga. Bar. No. 106361
>  Nathan Juster
>  Ga. Bar. No. 993962
>  Attorneys for Plaintiff/Debtor
>  ATLANTA LEGAL AID SOCIETY, INC.
>  777 Cleveland Ave SW
>  Suite 410
>  Atlanta, GA 30315
>  (678) 702-8413 (phone)
>  (404) 669-0944 (fax)
>  chipp@atlantalegalaid.org

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| IN RE | CASE NUMBER |
|---|---|
| **RISA ROZELLA HILL,** | **17-56656-SMS** |
| Debtor. | CHAPTER 7 |
| **RISA ROZELLA HILL,** | |
| Plaintiff, | ADVERSARY NUMBER |
| v. | **17-5131-SMS** |
| **EDUCATIONAL CREDIT MANAGEMENT CORPORATION,** | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I certify that on September 11, 2018, I filed Plaintiff's Trial Brief filed in the above-styled adversary proceeding using the CM/ECF system which will automatically send e-mail notification of such filing to the following persons:

Thomas W. Joyce
JONES CORK, LLP
PO Box 6437
Macon, GA 31208-6437

>*/s/ Cari E. Hipp*_____
>Cari E. Hipp
>Ga. Bar. No. 106361
>ATLANTA LEGAL AID SOCIETY, INC.
>777 Cleveland Ave SW
>Suite 410
>Atlanta, GA 30315
>(678) 702-8413 (phone)
>(404) 669-0944 (fax)
>chipp@atlantalegalaid.org

13