**IT IS ORDERED as set forth below:**

**Date: April 1, 2019**

_Sage M. Sigler_

_____

**Sage M. Sigler**
**U.S. Bankruptcy Court Judge**

_____

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | : | CASE NUMBER: |
| | : | |
| **RISA ROZELLA HILL**, | : | **17-56656-SMS** |
| | : | |
| Debtor. | : | CHAPTER 7 |
| _____ | : | |
| **RISA ROZELLA HILL**, | : | |
| | : | ADVERSARY PROCEEDING NO: |
| Plaintiff, | : | |
| | : | **17-05131-SMS** |
| v. | : | |
| | : | |
| **EDUCATIONAL CREDIT** | : | |
| **MANAGEMENT CORPORATION**, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

## MEMORANDUM OPINION REGARDING DISCHARGE OF STUDENT LOANS

Before the court is the above-captioned adversary proceeding commenced by Risa Rozella

Hill ("Debtor"), seeking to discharge her student loan debt pursuant to 11 U.S.C. § 523(a)(8). On

September 18, 2018, the adversary proceeding came before the Court for trial. The following

constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of

Bankruptcy Procedure 7052.[1]

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a).

This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I) as a determination of the

dischargeability of student loan debt.

## PROCEDURAL BACKGROUND

On April 11, 2017, Debtor filed a voluntary chapter 7 bankruptcy petition in the United

States Bankruptcy Court for the Northern District of Georgia, commencing Bankruptcy Case No.

17-56656 (the "Bankruptcy Case").[2] On May 19, 2017, Debtor filed a complaint against Navient

Solutions, Inc. ("Navient") and the U.S. Department of Education. (the "DOE") seeking a hardship

discharge of her student loans (the "Complaint," Docket No. 1).[3]

On June 6, 2017, Educational Credit Management Corporation ("ECMC") filed a Motion

to Intervene and Proposed Answer alleging Debtor's Federal Stafford education loans, made under

the Federal Family Education Loan Program ("FFELP Loans"), were transferred to it from United

Student Aid Funds, Kentucky Higher Education Assistance Authority, and Illinois Student

Assistance Commission, and requested it be added as a named defendant in the action.[4] (Docket.

No. 4). On June 16, 2017, Navient filed an answer asserting it was a servicing agent with respect

---

[1] Any findings of fact that are more properly construed as conclusions of law shall be so construed, and *vice versa*.

[2] Debtor received a discharge of eligible debts on August 14, 2017. (Bankruptcy Case Docket No. 16).

[3] Unless stated otherwise, all docket references are to the adversary proceeding docket.

[4] On July 26, 2017, United Student Aid Funds filed a letter with the Court dated July 18, 2017, which confirmed that Debtor's loans were transferred to ECMC on July 11, 2017. (Docket No. 13).

to FFELP Loans and certain Direct Stafford Loans owed to DOE, and that it had no authority to litigate the discharge of those loans. (Docket No. 5). On July 26, 2017, the Court approved a consent order between Debtor, Navient and ECMC that added ECMC as a defendant and dismissed Navient as a defendant.[5] (Docket No. 10). On July 27, 2017, ECMC filed its answer denying that Debtor's student loans are dischargeable. (Docket No. 11). On April 16, 2018, the Court approved a consent order between Debtor and DOE discharging all unpaid indebtedness owed to DOE pursuant to 11 U.S.C. § 523(a)(8). (Docket No. 42). ECMC remained as the sole named defendant in the action, and Debtor proceeded with trial solely against ECMC.[6]

On July 16, 2018, the Court approved the parties' joint consolidated pretrial order (the "PTO"), which contains facts to which the parties stipulated. (Docket No. 49). The parties submitted trial briefs on September 11, 2018, (Docket Nos. 53, 54), and Debtor submitted her proposed findings of fact and conclusions of law on September 13, 2018. (Docket No. 55). The Court held and concluded a trial on the matter on September 18, 2018. Present at trial were Thomas W. Joyce of Jones Cork, LLP on behalf of ECMC, Cari E. Hipp and Nathan T. Juster of Atlanta Legal Aid Society, Inc. on behalf of Debtor, and Debtor Risa Hill who provided testimony on her own behalf.   In addition to extensive medical records and other exhibits admitted into evidence, portions of the deposition testimony of Christopher Andrews, LPC, was also admitted into evidence at trial.

## FINDINGS OF FACT

Debtor is a single woman with no dependents and was forty-six years old at the time of trial. After serving in the U.S. Army, Debtor enrolled at Wichita State University in 1998, and she

---

[5] As a result, ECMC's motion to intervene was denied as moot. (Docket No. 15).

[6] The parties stipulated that ECMC is the current holder of all of Debtor's remaining student loan debt. PTO, ¶ 8E.

graduated in 2002 with a B.A. in Social Work.[7] In 2004, Debtor attended Newman College to pursue a master's degree in social work and business administration,[8] but she did not receive a degree. In 2005, Debtor attended Keller/DeVry University, and in fall of 2008, she graduated with a Master of Business Administration degree,[9] which she believed would help her stagnant career. While attending Keller/DeVry University, Debtor also took one class at Troy University in 2006.[10] Debtor's education was primarily funded by student loans. ECMC holds 23 separate loans of Debtor's with original principal balances totaling over $127,000.[11] At the time of her bankruptcy filing, Debtor's required student loan payment was $1,482.88 per month.[12] Prior to trial, ECMC unilaterally reduced Debtor's student loan balance to $70,000.[13]

Since graduation from Wichita State University, Debtor has held various jobs in the human resources and recruiting field.[14] From 2002 through 2013, Debtor's income was as follows:[15]

| YEAR | EARNINGS | YEAR | EARNINGS |
|------|----------|------|----------|
| 2002 | $16,094.25 | 2008 | $20,488.71 |
| 2003 | $24,821.03 | 2009 | $23,699.16 |
| 2004 | $21,322.47 | 2010 | $20,725.24 |
| 2005 | $27,112.73 | 2011 | $27,895.51 |
| 2006 | $29,631.71 | 2012 | $39,673.56 |
| 2007 | $30,142.69 | 2013 | $26,589.16 |

In 2013, Debtor began to experience symptoms of psychosis that rendered her unable to work. Debtor's symptoms included delusions, hallucinations, and voices in her head that instructed

---

[7] PTO, ¶ 8P.

[8] *Id.* at ¶ 8Q.

[9] *Id.* at ¶ 8R.

[10] *Id.* at ¶ 8S.

[11] *Id.* at ¶ 8A. In its Trial Brief, ECMC asserted that the balance due as of July 5, 2017, was $180,725.80, but no evidence was submitted at trial as to the balance currently due. Def.'s Trial Brief, Docket No. 54, p. 5.

[12] Pl.'s Trial Ex. K.

[13] PTO, ¶ 8B.

[14] Def.'s Trial Ex. A (Plaintiff's Resume).

[15] PTO, ¶ 8V.

her to behave in certain ways. In October of 2013, while she was living and working in Texas, she found herself in an airport in Louisiana with no memory of how she got there. Thereafter, she was hospitalized several times in Texas, Arizona, and Florida, and was homeless for several months.

On June 2, 2014, Debtor was involuntarily committed by the Georgia Department of Behavioral Health and Developmental Disabilities ("DBHDD"). The DBHDD examiner noted that Debtor was experiencing auditory hallucinations, was very depressed, and that Debtor had committed or expressed recent acts or threats of violence to herself.[16] Debtor was diagnosed with Bipolar Type I disorder with psychotic features and post-traumatic stress disorder ("PTSD").

On or about June 3, 2014, Debtor was admitted to the Southern Crescent Behavioral Health System, Anchor Hospital Campus. During Debtor's initial psychiatric evaluation, the examiner indicated the following were justifications for impatient admission:[17]

1. Dangerous to self, others, or property and is requiring a controlled environment

2. Hallucinations, delusions, anxiety, depression resulting in significant loss of functioning

---

4. Acute disorganized/bizarre behavior or psychomotor agitation or retardation that interferes with the activities of daily living (ADL) so the patient cannot function at a less intensive level of care

---

6. Evaluation or treatment of a psychiatric co-morbidity (risk of suicide, violence, severe depression) warranting impatient admission for patients with a dementia disorder

7. Failure in social, interpersonal, occupational, and/or educational functioning.

Four months later, on October 10, 2014, Debtor was evaluated by the DeKalb Community

---

[16] Pl.'s Trial Ex. B (GA DBHDD Form 1013 – Certificate Authorizing Transport to Emergency Receiving Facility and Report of Transportation (Mental Health) dated June 2, 2014).

[17] Pl.'s Trial Ex. E (Initial Psychiatric Evaluation dated June 4, 2014).

Service Board after Debtor contacted 911 emergency services because she thought someone had put something in her water. Debtor was transported to the emergency room and the emergency room report indicated that Debtor was psychotic, noting that Debtor believed that many people were out to harm her and that the doctors were imposters and not really doctors.[18] Less than a month later, on November 2, 2014, Debtor was admitted to Anchor Hospital with the chief complaint of mood swings. The examiner noted her "insight and judgment limited. ADLs are poor."[19] She was discharged on November 10, 2014.

Debtor has not returned to work since 2013 due to her mental illnesses, and with lack of income, Debtor has not made any student loan payments. While she was homeless and out of desperation for income, Debtor applied for a job with Comcast in 2015. However, Debtor testified that she could not have managed the responsibilities required by that job. Debtor was thereafter approved for Social Security Disability Insurance benefits ("SSDI") and has not sought paid work since that time.

Even prior to her illness, Debtor never made payments on her student loans because she could not afford the monthly payment amount. Despite not having made student loan payments, Debtor's student loans have never been in default. According to her testimony and the parties' stipulated facts, Debtor was enrolled in school from the time she began incurring her student loan debt until 2011. Debtor worked full time without attending school during 2011 and 2012, but did not make payments on her loans during that time due to a series of forbearances and deferments granted by the lenders and/or servicers.[20]

In 2015, while Debtor was homeless, she was approved for SSDI. The Social Security

---

18 Pl.'s Trial Ex. H (Psychiatric Evaluation).

19 Pl.'s Trial Ex. G (Anchor Hospital Discharge Summary).

20 PTO, ¶¶ 8V, 8Y, 8Z.

Administration determined that Debtor met the standard for disability under their rules and declared the date of disability onset to be October 15, 2013.[21] Debtor receives $1,341.00 in SSDI benefits each month, which is currently her sole source of income. Around the time Debtor was approved for SSDI, a case worker at Grady Hospital helped Debtor qualify for a housing voucher from the Atlanta Housing Authority and assisted her in finding housing. Debtor previously received $16 per month in food assistance, but she failed to file the appropriate paperwork to renew that benefit. Debtor's medications and therapy are largely funded by Medicare and a Medicare Savings Program. Debtor does not receive SSDI directly due to a concern that Debtor would be unable to manage her SSDI benefits; her benefits are paid to a Representative Payee who is charged with managing the funds and paying Debtor's living expenses.

At the time of her bankruptcy filing, Debtor's average monthly expenses totaled $1,143.00:[22]

| Rent | $205 | Food/Supplies | $360 | Medical Co-Pays | $40 |
|------|------|---------------|------|-----------------|-----|
| Renter's Insurance | $22 | Clothing | $50 | Transportation | $95 |
| Utilities | $175 | Personal Care | $75 | Vehicle Insurance | $121 |

At the time of trial, Debtor's rent had decreased by $14 and Debtor's vehicle was no longer operational, but Debtor's SSDI Representative Payee was saving the vehicle related funds to purchase and insure another vehicle. The rent listed in Debtor's budget is the net amount of rent she pays out of her SSDI benefits after application of the housing voucher. On average, Debtor has $212.00 of surplus income per month, which she relies on for unbudgeted living and medical expenses. Debtor's budget does not include any line items for savings, entertainment, or recreation, and allocates only $360 per month for food and housekeeping supplies and $125 per month for

---

[21] Pl.'s Trial Ex. A (Benefits Planning Query (BPQY) issued by the Social Security Administration dated July 31, 2017).

[22] Pl.'s Trial Ex. Q (Bankruptcy Schedules I/J); Def.'s Trial Exs. B & C (Bankruptcy Schedules I & J).

electricity/gas and water/sewer.[23]  It is unclear what telecommunication/cable services are utilized

by Debtor, but her budget allocates only $50 per month for telephone, internet, and cable.[24]

In connection with this litigation, Christopher Andrews ("Andrews"), a Licensed

Professional Counselor who participates in Debtor's treatment for PTSD and bipolar disorder, was

deposed and the parties offered portions of Andrews' deposition testimony, which were admitted

into evidence. Debtor participates in a 12-session cognitive processing therapy program to treat

PTSD, which may in the future reduce the symptoms of Debtor's PTSD to a manageable level.

PTSD, however, is only one of Debtor's diagnoses, the other being Bipolar Type I disorder with

psychotic features. For her bipolar disorder, Debtor takes lithium twice a day and a medication to

help her sleep because lack of sleep can trigger a bipolar episode. Debtor experiences serious side-

effects from the lithium including tremors, short term memory and concentration loss, dizziness,

fatigue and digestive distress. Without this medication, Debtor would likely experience additional

psychotic episodes and require hospitalization. Indeed, that was Debtor's fate the last time she was

unmedicated. Debtor also takes medication to treat the digestive issues caused by the lithium, anti-

depressants, anti-anxiety medication, and medication to manage her blood pressure. What is

abundantly clear from the evidence is that while Debtor's PTSD may become manageable, in order

to remain mentally stable, Debtor will indefinitely have to take medications with significant side

effects that impede her ability to work.

A team of doctors, therapists, case workers, and community advocates manage Debtor's

care and work to ensure that she remains mentally, physically, and financially stable. Much of this

is managed through the Grady Health System and is only available to Debtor as a result of her

---

[23] *Id.*

[24] *Id.*

disabled status and resulting eligibility for SSDI and Medicare. In addition to the 12-session cognitive processing therapy program, Debtor participates in numerous other group and individual therapy programs. Debtor participates in Psychosocial/Psychiatric Rehabilitation ("PSR") three times a week, which is designed to assist Debtor with communication, socialization, and interpersonal skills, and to educate Debtor about her mental illnesses. Debtor also has weekly individual therapy sessions and is monitored for medication adjustments every three months. Debtor must also stay physically active and ensure that she receives an adequate amount of sleep to avoid a bipolar episode. Debtor currently volunteers at the information desk of a VA hospital for approximately 4 hours per week, providing visitors with directions. Debtor also volunteered once through church to feed the homeless and would like to pursue similar volunteer opportunities.

ECMC suggested at trial that Debtor could seek an administrative discharge of her loans due to her disability. To obtain an administrative discharge, a doctor must complete paperwork certifying that Debtor's inability to engage in substantial gainful activity has lasted for 60 months or can be expected to last for a continuous period of not less than 60 months.[25] Debtor applied for an administrative discharge in 2015, but did not file the required certification.[26]

ECMC also suggested Debtor could seek to repay her loans through the Revised Pay as You Earn ("REPAYE") program. REPAYE is a program that determines a borrower's monthly student loan payment amount based on her income and employment status.[27] Prior to entering the REPAYE program, Debtor would have to apply and be approved for the consolidation of her existing loans. If approved, the repayment period under REPAYE would be 20 years, and at the

---

[25] Def. Trial Ex. D (Debtor's Disability Discharge Application (May 13, 2015)).

[26] *Id.*

[27] Def. Trial Ex. E (January 24, 2018 Letter to Plaintiff re: Revised Pay as You Earn (REPAYE) repayment program).

end of the term the balance of the debt would be cancelled.[28] The payment amount is recalculated annually, which requires an annual recertification of income.[29] If Debtor were to enter the REPAYE program, Debtor's monthly payment would be $0.[30] Debtor received a letter regarding the REPAYE program, but elected to not enter the REPAYE program out of concern that if she ever failed to submit the annual recertification her loans could go into default, which could result in offsets of her SSDI benefits. Debtor's student loan balances contribute to her struggle with anxiety and depression, but the memory loss caused by lithium would make it difficult for Debtor to comply with the administrative requirements of a program like REPAYE.

## CONCLUSIONS OF LAW

11 U.S.C. § 523(a)(8) provides that student loans are excepted from discharge "unless excepting such debt from discharge will impose an undue hardship on the debtor and debtor's dependents." The Eleventh Circuit has adopted the *Brunner* standard in finding undue hardship. *Hemar Ins. Corp. Am. v. Cox (In re Cox)*, 338 F.3d 1238 (11th Cir. 2003); *see Brunner v. New York State Higher Educ. Servs Corp.*, 831 F.2d 395 (2d Cir. 1987). Under the *Brunner* standard, Debtor has the burden to prove that:

1) she cannot maintain, based on current income and expenses, a minimal standard of living for herself and dependents if forced to repay the loan;

2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant period; and

3) that she has made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396.

Debtor must prove all three elements of the *Brunner* test by a preponderance of the

---

[28] *Id.*

[29] *Id.*

[30] *Id.*

evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). If Debtor fails to prove just one element, the inquiry ends, and the student loans will not be discharged. *Gordon v. U.S. Dep't. of Educ.* (*In re Gordon*), Adv. Proc. No. 07-09049-MGD, 2008 WL 5159783, at *5 (Bankr. N.D. Ga. Oct. 10, 2008).

## I.    Minimal Standard of Living

First, Debtor must prove that she cannot "afford the basic living necessities if forced to repay the loan." *Id.* at *6. "[T]he Court must apply its common-sense knowledge gained from ordinary observation in daily life and general experience to determine whether Debtor's expenses are reasonable and necessary." *Id.* (quoting *Douglas v. Educ. Mgmt. Corp. (In re Douglas),* 366 B.R. 241, 253–54 (Bankr. M.D. Ga. 2007)). Debtor must demonstrate "more than a showing of tight finances." *Adams v. Educ. Credit Mgmt. Corp.* (*In re Adams*), Adv. Proc. No. 15-05413-WLH, 2016 WL 8943802, at *3 (Bankr. N.D. Ga. Nov. 18, 2016). In America, "shelter, basic utilities, food and personal hygiene products, vehicles, and the costs associated with a vehicle, health insurance, and some source of recreation" are deemed necessary for a minimal standard of living. *Gordon*, 2008 WL 5159783, at *6 (citing *Ivory v. U.S. (In re Ivory)*, 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001)).

There is no real dispute that Debtor cannot afford to repay her loans. Debtor's sole income is SSDI in the amount of $1,341, and based on Debtor's household size of 1, she is below 150% of the applicable federal poverty guideline of $1,517.50 per month. Debtor's expenditures consist of necessities, and she primarily relies on a housing voucher to pay rent. While Debtor's budget indicates an approximately $200 surplus, the Court questions whether the Debtor's budgeted amounts for food, household supplies, and utilities are sufficient to meet her basic needs. Regardless, Debtor's "surplus" is insufficient to cover the more than $1,400 per month due on her

student loans at the time she filed her Complaint, or the more than $770 per month due after ECMC unilaterally reduced Debtor's student loan balance after the filing of the Complaint.[31]

ECMC argues Debtor could make payments on her student loans and maintain a minimal standard of living if she were to enroll in REPAYE, because she would not be required to pay anything. The Court is not persuaded. Debtor's inability to make student loan payments while maintaining a minimal standard of living is evidenced by ECMC's own REPAYE calculation. Monthly payments under REPAYE are capped at 10% of the borrower's discretionary income, which is the difference between the borrower's adjusted gross income and 150% of the poverty level for borrower's family size.[32] The REPAYE calculation reveals that Debtor has no discretionary income to expend on student loan payments. The very reason Debtor's payment amount would be zero-dollars a month under REPAYE is because she cannot afford to make payments on her student loans and maintain a minimal standard of living.

Some courts have rejected the availability of repayment plans as a basis for finding Debtor's net income sufficient to repay the loans and maintain a minimal standard of living. *Regan v. Educ. Credit Mgmt. Corp. (In re Reagan)*, 587 B.R. 296, 302 (Bankr. W.D. Pa. 2018) ("a present inability to maintain a minimal standard of living renders the [REPAYE] irrelevant under the first prong of the Brunner test") (internal quotation omitted); *see also Pierson v. Navient (In re Pierson)*, Adv. Proc. No. 17-3096, 2018 WL 4849658, at *5 (Bankr. N.D. Ohio Oct. 4, 2018); *Thomsen v. Dep't. of Educ. (In re Thomsen)*, 234 B.R. 506, 512 (Bankr. D. Mont. 1999). Some courts reason that having a zero-dollar payment is not "repayment" at all because no payment is

---

[31] *See* Pl.'s Trial Brief, Docket No. 53, p. 6 (Although ECMC has reduced the total loan amount to $70,000, Debtor argued "[e]ven assuming repayment based on this lower amount, at a standard 6% fixed rate for graduate loans over a standard 10-year repayment, … the monthly payment [would] be $777.14").

[32] PTO, ¶ 8I.

being made towards the principal balance, let alone interest on the principal that continues to accrue. *See, e.g., Pierson*, 2018 WL 4849658, at *6 (citing *Nightingale v. N.C. State Educ. Assistance Auth. (In re Nightingale)*, 529 B.R. 641, 650 (Bankr. M.D.N.C. 2015)). This Court agrees.

Debtor has been deemed permanently disabled by the Social Security Administration and no significant improvement in Debtor's condition or income is anticipated. The repayment period under REPAYE is 20 years, during which time Debtor's balance will only increase as unpaid interest continues to accrue. Requiring Debtor's participation in such a program will do nothing but impose an ongoing administrative burden on Debtor and create possible tax implications that may arise after the debt is cancelled subsequent to the repayment period. *See Pierson*, 2018 WL 4849658, at *6; *see also Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon)*, 435 B.R. 791, 802 (B.A.P. 1st Cir. 2010) ("participation in [repayment programs] may not be appropriate for some debtors because of the impact of the negative amortization of the debt over time when payments are not made and the tax implications arising after the debt is cancelled … Because of these considerations, [REPAYE] may be beneficial for a borrower whose inability to pay is temporary and whose financial situation is expected to improve significantly in the future."). In this instance, such tax implications and Debtor's failure to satisfy them could also put Debtor's SSDI benefits at risk.

Moreover, eligibility for the REPAYE program requires an annual recertification of Debtor's income. Debtor testified that her mental illnesses have previously prevented her from keeping up with paperwork, including student loan documentation. Administrative compliance for disabled individuals like Debtor is a great burden. Indeed, Debtor recently forgot to complete the paperwork necessary to maintain much needed food assistance benefits. In addition to having a

Representative Payee receive and distribute her SSDI benefits, Debtor has a team of doctors, social workers, and case workers who ensure that her medical services, housing voucher, and certain other benefits and community services are maintained. There was no indication at trial that this team would be able to assist Debtor with annual student loan paperwork, nor did ECMC present argument or evidence that such assistance is available to borrowers like Debtor. It may not be possible for Debtor to comply with the annual recertification required to participate in a repayment plan such as REPAYE, and the risk of non-compliance is too high. First, Debtor would no longer be eligible for the REPAYE program and the full monthly amount would be due, which Debtor unquestionably cannot afford to pay. Then, Debtor would default on her loans, which could result in an offset of her SSDI benefits. Without SSDI, Debtor would have no income, rendering her unable to maintain any of her basic living expenses.

The test under *Brunner* is not whether Debtor would be able to maintain a minimal standard of living if she made payments under REPAYE or another income-based repayment program. Rather, the test is whether Debtor can maintain a minimal standard of living if she is forced to repay the actual outstanding student debt. *See Brooks v. Educ. Credit Mgmt. Corp (In re Brooks)*, 406 B.R. 382, 393 (Bankr. D. Minn. 2009) ("the inquiry is to the debtor's ability to repay the loan, not simply to make payments"). If courts were to conclude that availability of administrative programs such as REPAYE demonstrate that a debtor could repay the loans without affecting her ability to maintain a minimal standard of living, no debtor would be entitled to an undue hardship discharge of their student loans. *See Nightingale*, 529 B.R. at 649-50 ("accepting the concept of a zero payment as constituting 'repayment'… effectively eliminates the hardship discharge provision for student loans for those most likely to be entitled to it").

Debtor's current income would not allow her to maintain a minimal standard of living if

forced to repay her loans, and participation in a program such as REPAYE is neither required by the law nor feasible for Debtor. The Court therefore concludes that Debtor has met her burden of proving that she cannot maintain a minimal standard of living if forced to repay her student loans.

## II.    Persistent State of Affairs

Next, Debtor must prove that "she cannot maintain a minimal standard of living for a significant portion of the repayment period if the loans are not discharged" due to additional circumstances not within her control. *Gordon*, 2008 WL 5159783, at \*7. The debtor must show with a "certainty of hopelessness" that her financial condition will not improve in the future. *Id.* (quoting *Douglas*, 366 B.R. at 256). Additional circumstances include "debtor's serious physical or mental disability, lack of usable or marketable job skills, and lack of assets that could be used to pay the loan." *Educ. Credit Mgmt. Corp. v. Mosley (In re Mosley)*, 494 F.3d 1320, 1326 (11th Cir. 2007) (citing *Educ. Credit Mgmt Corp. v. Nys,* 446 F.3d 938,947 (9th Cir. 2006)).

ECMC does not dispute that Debtor's mental illnesses are not within her control, but argues Debtor has not shown with a certainty of hopelessness that her current financial condition will persist throughout the repayment period. ECMC points to Andrews' deposition testimony to draw the conclusion that "therapy along with medication, will cure [Debtor's] PTSD" and posits that Debtor will return to work.[33] This statement is taken out of the context of those portions of Andrews' testimony that were admitted into evidence. The evidence indicates that Debtor's successes in therapy include socialization such as taking a walk with a group and speaking during group therapy – a far stretch from being able to return to gainful employment. Further, it ignores Debtor's bipolar diagnosis and the debilitating side-effects that Debtor suffers from the medication required to treat it. Andrews' most promising testimony regarding Debtor's condition was that

---

[33] Def.'s Trial Brief, Docket. No. 54, p. 9.

eventually Debtor "may not need treatment for the anxiety and depression as far as the individual therapy," but he could not say that Debtor "ever would be off the medications."[34]

Regarding Debtor's ability to obtain employment, the question is not whether Debtor can obtain employment, but rather whether "[d]ebtor's inability to make the loan payments within the repayment period is persistent." *Adams*, 2016 WL 8943802, at *5. Debtor suffers from bipolar disorder with psychotic features and PTSD. Based on those disabilities, Debtor was approved for, and currently receives, SSDI, which is granted only to those with persistent disabilities.[35] Debtor's disability has persisted since her first psychotic episode in 2013, and while one of her therapists indicates that she has made progress in treating her PTSD such that she is becoming more comfortable around other people, the weight of the evidence demonstrates that Debtor's condition will persist indefinitely. Any "recovery" from Debtor's bipolar disorder is purely speculative and unsupported by the evidence. Further, Debtor's weeks are a series of therapy sessions and appointments with the myriad of doctors, social workers, and case workers who work to keep Debtor healthy, stable, and housed. The Court cannot imagine a scenario in which Debtor would be able to balance the work required to avoid succumbing to her illnesses and the work required of being gainfully employed. It follows that Debtor's sole income will continue to be SSDI and Debtor's inability to make the loan payments will unquestionably persist through the repayment period.

Even assuming Debtor could return to work, the Court concludes that Debtor's inability to

---

[34] *Id.* (citing Andrews' Deposition, at p. 60, L. 14-19).

[35] Pl.'s Trial Brief, Docket No. 53, p. 7 (citing 42 U.S.C.A. § 423(d)(1)(A)), which provides that an individual is considered disabled and eligible to receive SSDI if the individual is "[unable] to engage in any substantial gainful activity by reason of any medically determined physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months"). 42 U.S.C.A. § 423(d)(2)(A) further provides that an individual will only be determined to be disabled if he "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work."

maintain a minimal standard of living if forced to repay her loans will persist. Debtor was never a high-earning individual. [36] Between 2002 and 2013, Debtor's average annual income was approximately $25,000. During that time, Debtor's income did not increase each year, and some years showed a material decrease from the prior year. It is highly unlikely that Debtor will obtain employment earning more than she did previously. *See Barrett v. Educ. Credit Mgmt. Corp. (In re Barrett)*, 487 F.3d 353, 360 (6th Cir. 2007) ("a debtor's work history is a relevant and significant consideration in projecting whether a debtor's current state of affairs is likely to persist") (citing C*heesman v. Tenn. Student Assist. Corp. (In re Cheesman)*, 25 F.3d 356, 360 (6th Cir. 1994)). This is especially true considering her disabilities, which Debtor credibly testified prevent her from engaging in gainful work. The prospect of Debtor obtaining and maintaining employment commensurate with her prior jobs is, unfortunately, hopeless.

Even if Debtor were able to return to work and earn a salary similar to her earnings prior to the onset of her disability, Debtor would not be able to make her required student loan payments and maintain a minimal standard of living. In that "best case" scenario, Debtor would lose her SSDI benefits, her housing voucher, and Medicare, which provides the medications and therapy necessary to keep her mental illnesses under control. It is inconceivable that Debtor could fund market-rate rent, basic necessities, all of the medications and therapies necessary to keep her stable (or a health plan that would provide sufficient coverage), and a student loan payment in excess of $770 per month. Without access to her medications and therapy, Debtor will inevitably become vulnerable to the risk of psychotic episodes, as she has suffered on many occasions previously. Debtor's psychological condition caused her to experience delusions and auditory hallucinations, resulting in her confinement to a hospital on multiple occasions. Even if Debtor were to be

---

[36] *See* PTO, ¶ 8V.

employed, Debtor's psychological condition is fragile; the high likelihood of it significantly impairing her ability to maintain employment is undeniable.

The evidence overwhelmingly demonstrates that Debtor's condition – both psychological and financial – will persist indefinitely. The Court thus concludes that Debtor has satisfied her burden of demonstrating that her inability to make student loan payments will persist for a significant portion of the repayment period.

### III.    Good Faith Efforts to Repay the Loan

Last, the Court must consider whether Debtor has made a good faith effort to repay her student loans. "Good faith is measured by the debtor's efforts to obtain employment, maximize income, and minimize expenses." *Mosley*, 494 F.3d at 1327. Debtor must prove her financial condition was not willfully or negligently caused by her, but rather it is a result of factors beyond her control. *Id*. ECMC argues Debtor has not made good faith efforts to repay the loans because she has never made a single payment, and that Debtor has not acted in good faith because she has not elected to take advantage of administrative relief available, including the REPAYE program and/or an administrative discharge. The Court disagrees.

"[D]ebtor's failure to make a payment standing alone, does not establish a lack of good faith." *Id.* (quoting *Educ. Credit Mgmt Corp. v. Polleys (In re Polleys),* 356 F.3d 1302, 1311 (10th Cir. 2004)). Although Debtor has not made any payments on her loans, Debtor's good faith intent to repay the loans is evident given that her loans have never been in default. Debtor was a student from the time she first incurred student loan debt through 2010. 2011 and 2012 were the only periods prior to the onset of Debtor's disability that she worked without being in school. Debtor testified that she was unable to afford the required student loan payments during that time, and she followed the process required of a borrower to receive forbearances and deferments, which the

lenders granted. *Compare Brunner*, 831 F.2d at 397 (finding lack of good faith because Debtor failed to seek a deferment) *with U.S. Dept. of Educ. v. Wallace (In re Wallace)*, 259 B.R. 170, 185 (Bankr. C.D. Cal. 2000) (finding bad faith where debtor lacked diligence in pursuing repayment options); *see also McMullin v. U.S. Dep't of Educ., et al. (In re McMullin)*, 316 B.R. 70, 79 (Bankr. E.D. La. 2004) ("debtor's requests for a deferment or forbearance constitutes another indication of the debtor's good faith"). Good faith effort only requires the debtor to have made payments when she was in a position to make such payments. *Thompson v. N.M. Student Loan Guarantee Corp. (In re Thompson)*, 329 B.R. 145, 184 (Bankr. E.D. Va. 2005). Debtor was never in such a position.

Moreover, in the Eleventh Circuit, failure to participate in an income contingent repayment program is not *per se* bad faith. *Mosley*, 494 F.3d at 1327; *see also Cleveland v. Educ. Credit Mgmt. Corp., et al. (In re Cleveland)*, 559 B.R. 265, 273 (Bankr. N.D. Ga. 2016); *Macon v. U.S. Dept. of Educ. (In re Macon)*, Adv. Proc. No. 13-4014-PWB, 2014 WL 5080410, at *4 (Bankr. N.D. Ga. Oct. 6, 2014). If the Court "requires a continuous effort to repay the student loans through an administrative program, then the absurd result is that a student loan debt is never dischargeable" because doing so "grafts a regulatory requirement (participation in an administrative program) on to § 523(a)(8) that simply does not exist in the statute and undermines this Court's ability to examine whether all of the Debtor's circumstances support a finding of 'undue hardship.'" *Macon*, 2014 WL 5080410, at *4 (citing *Roth v. Educ. Credit Mgmt. Corp. (In re Roth)*, 490 B.R. 908, 920 (9th Cir. B.A.P. 2013); *Kriger v. Educ. Credit Mgmt Corp.,* 713 F.3d 882, 884 (7th Cir. 2013)); *see also Barrett*, 487 F.3d at 364.

Finally, ECMC argues that Debtor's student loans comprise 78% of the total debt scheduled in the Bankruptcy Case and that is an indicia of Debtor's bad faith in filing the Bankruptcy Case with the predominant motivation of discharging her student loan debt. That

position is wholly unsupported by the record. The schedules filed in the Bankruptcy Case indicate that, as of Debtor's bankruptcy filing, she had assets of $3,700, comprised of a non-working vehicle worth $850, a deposit with Georgia Power in the amount of $250, and furniture, household items, and clothing with a total value of $2,600.[37]  In addition to her student loan debt, Debtor had over $55,000 in liabilities resulting from credit card debt, medical debt, and obligations owing to former landlords and utilities.[38]  Most of this debt is held by debt purchasers, indicating that it was incurred long before the filing of the Bankruptcy Case. The fact that Debtor's student loan balances happen to constitute a large percentage of her total debt is not determinative. Here, Debtor had a legitimate basis for seeking bankruptcy relief separate and apart from seeking a hardship discharge of her student loan debt.

Debtor's efforts to obtain the forbearances and deferments necessary to keep her loans out of default are indicative of her good faith, and Debtor's inability to make payments prior to the onset of her disability does not negate that. Debtor's reasons for not pursuing relief through a repayment plan or other administrative program are justified. Accordingly, the Court concludes that Debtor has met her burden of proving that she has made good faith efforts to repay her student loans.

**CONCLUSION**

Debtor is a bright, educated woman who served her country and had a dream to help others as a social worker. Well into her adulthood, soon after she completed her education, she suffered a psychotic episode, became homeless, was diagnosed with multiple mental illnesses, and has struggled to remain stable since that time. Debtor has shown by a preponderance of the evidence

---

[37] (Bankruptcy Case, Docket No. 1).

[38] *Id.*

that repayment of her student loans would impose an undue hardship. The evidence clearly established that, despite Debtor's education, her mental illnesses prevent her from obtaining gainful employment, and she relies on SSDI as her sole income. Consequently, Debtor cannot maintain a minimal standard of living if she is forced to repay her student loans. This state of affairs is likely to persist for a significant portion of the repayment period due to the permanent nature of her mental illness. Despite not having made any payments on the loans, Debtor was never in a position to make payments and she acted in good faith by ensuring her loans never went into default. For these reasons, Debtor is entitled to a hardship discharge of her student loan debt under 11 U.S.C. § 523(a)(8). Accordingly, it is

**ORDERED** that judgment is for the Debtor.

## END OF DOCUMENT